STATE of Iowa, Appellee,

v.

Harlan Price THOMAS, Appellant.

No. 53114.

Supreme Court of Iowa.

Nov. 12, 1968.

John W. Gailey, Fort Dodge, for appellant.

Richard Turner, Atty. Gen., James C. Sell, Asst. Atty. Gen., David A. Opheim, County Atty., and Terry W. Guinan, Asst. County Atty., for appellee.

STUART, Justice.

Defendant was indicted for murder by the Webster County Grand Jury. He was tried and the jury returned a verdict of guilty of manslaughter. Defendant appeals contending trial court erred (1) by allowing expert testimony based on hearsay, (2) by failing to give defendant's requested instruction, and (3) by failing to grant a new trial when prosecutor failed to disclose evidence favorable to defendant upon request.

On Saturday, October 28, 1967, around midnight, defendant Harlan Price Thomas, went to the home of decedent, Fred Newton Williams, in Fort Dodge. Apparently decedent was running a "boot-leg joint". There was a juke box in the house and people gathered there. A dispute arose between deceased and defendant over the change due defendant from purchases of beer. Defendant grabbed Williams as he turned to leave the room, saying he would not allow Williams to go and get something to hit him with and continued demanding his change. Thomas began hitting Williams about the head with his fists and hands telling him he was going to beat him until he got his money. Thomas pulled decedent outside where the beating continued until decedent cut Thomas on the head with a knife. Defendant Thomas left the scene and Williams returned to the house where he cleaned up, played cards and went to bed. Defendant was 36 years old and decedent was 72 years old at the time.

Sunday afternoon Williams became ill. On Monday he went into convulsions. He was taken to the hospital in Fort Dodge where he was examined by Dr. Tyler who referred him to the Veteran's Hospital in Des Moines. At the Veteran's Hospital decedent's condition worsened, a craniotomy was performed on Wednesday November 1, and the patient died November 5.

I. Defendant claims trial court erred in overruling defendant's motion to strike Dr. Song's opinion as to the cause of decedent's death contending the opinion was based on hearsay. Dr. Joseph Song, a certified pathologist, performed an autopsy on decedent on November 5, 1967. The record does not support the claim Dr. Song's opinion as to the cause of death was based on hearsay. On direct examination he indicated several times his opinion was based upon observations made at the time of the autopsy. At one point he testified:

"Q. Do you have sufficient evidence then, based upon your autopsy report [which was admitted into evidence without objection] and your objective findings, to have reached an opinion as to the cause of death of this man? A. The cause of death in my opinion, based on autopsy, is an extensive subdura hematoma with hemorrhagic infarction of the brain substance. That we believe is the cause of it.

"Q. And the subdura hematoma, or subdural hematoma, found, would be one in your opinion inflicted by trauma? A. Yes, it has to be associated with trauma.

"Q. There is just no other answer? A. No other answer."

The basis of the alleged error is found in the cross examination of Dr. Song. He was asked:

"Q. Your prosecuting, or your autopsy rather, was predicated in part, at least, upon the history obtained from Dr. Luka? A. No, sir, autopsy procedure has nothing to do with the history given by Dr. Luka.

"Q. I didn't mean that, sir. I meant that the trauma of which you speak, the origin of the trauma of which you speak, must necessarily be based upon the history you obtained from Dr. Luka? A. Partly, yes."

He also testified it was partly from his observations and partly from conversations with Dr. Henry Decker who performed the craniotomy.

Nowhere did Dr. Song identify the trauma which caused the subdura hematoma. We do not interpret the above cross examination as indicating his autopsy report or the conclusion reached therein was based on anything but his examination. In fact, he definitely denies that the history had anything to do with his autopsy report.

In any event the admission of Dr. Song's opinion that death was caused by trauma was without prejudice as it was merely cumulative. The autopsy report and the certificate of death listed trauma as the cause of death and were admitted into evidence without objection. We find no error in the admission of Dr. Song's testimony as to cause of death.

II. One medical history taken by an attending physician indicated decedent had hit his head in a fall a week before the fight. A second history placed the fall a day before the fight. Defendant claims it was therefore purely conjectural for the jury to contemplate the actual cause of death and that a verdict should have been directed in favor of defendant. We do not agree. There is evidence defendant gave decedent a severe beating about the head either late Saturday night or early Sunday morning. There is evidence deceased was completely normal as late as 9:00 p.m. on the 28th with no marks or injuries of any kind. He was bruised and his head was swollen on the right side after the fight. Dr. Song testified the blood clots found under the dura were not more than seven days old. There was sufficient evidence to make a jury question as to the cause of death.

III. On direct examination by the county attorney Edna Howard, decedent's daughter, testified she was with her father until about 4:00 p.m. on Saturday preceding the fight. When recalled later before the State rested its case she corrected her previous testimony saying she was previously mistaken and that she had been with her father until about 9:00 p.m.

Dr. Tyler, a witness for the State, testified he took a history of decedent from his daughter in which she stated deceased had had an injury about a week or so prior to hospitalization and had been in a fight a day or two before coming to the hospital. He was unable to identify Mrs. Howard, but Mrs. Howard conceded she had given a history to the doctor. When recalled after Dr. Tyler had been on the witness stand, she testified she told the doctor her father fell "a couple of months ago". On recross examination she testified:

"Q. Are you telling us Dr. Tyler was mistaken about when this occurred? A. I am telling you Dr. Tyler is mistaken."

On the basis of the variance disclosed by these bits of evidence, defendant requested the following instruction on impeachment, which the trial court refused.

"1. Evidence has been offered purporting to show that witnesses have made previous statements at variance with or in contradiction of their testimony in this trial.

"This is one of the recognized methods of impeaching a witness and discrediting

his testimony and should be considered for no other purpose. It is for the jury to say whether a witness has been successfully impeached. You may disregard the testimony of an impeached witness, but are not bound to do so if the testimony is corroborated by other credible evidence, or if for any other reason, you believe such testimony to be true. The credit and weight of the testimony of the witnesses are to be determined by the jury alone, in view of all the evidence and all the facts and circumstances of the case."

■■ This was not a proper place for such instruction. It is related to and dependent upon the introduction of impeaching testimony which, except when the witness is a party, (see State v. Hephner, Iowa, 161 N.W.2d 714, filed October 15, 1968) is not admissible until a proper foundation has been laid by giving the witness being impeached the opportunity to affirm or deny the claimed prior inconsistent statements. State v. Pilcher, Iowa, 158 N.W.2d 631, 636–637; Mead v. Scott, 256 Iowa 1285, 1294, 130 N.W.2d 641, 646; Law v. Hemmingsen, 249 Iowa 820, 834–835, 89 N.W.2d 386, 396. No impeachment procedure was followed here. The contradictory evidence is in the record without limitation to impeachment purposes. A witness may contradict her prior statements introduced as substantive evidence and her testimony is to be weighed by the jury under the general instruction on credibility.

■■ Furthermore, all testimony relating to the hour on October 28 when Mrs. Howard left her father occurred during the trial. "Impeachment is by showing contradictory statements which have been made out of court and which are at variance with the testimony at the trial." State v. Griffith, 241 Iowa 1328, 1330, 45 N.W.2d 155, 156. It is within the court's discretion to permit a witness to correct testimony previously given. 98 C.J.S. Witnesses, § 318 b, p. 17.

■ The trial court did not err in refusing to give the requested instruction on impeachment. See State v. Torrence, 257 Iowa 182, 188–190, 131 N.W.2d 808, 811–812.

IV. Dr. Giles, the first doctor to see decedent in Fort Dodge after the beating, Dr. Decker and his assistant Dr. Kia, who performed the craniotomy on decedent and Dr. Leo Luka, Polk County Medical Examiner, who prepared a written history for decedent at Veteran's Hospital including a statement that he had fallen October 27, 1967, did not testify before the grand jury and were not called as witnesses by the state.

Defendant claims because of the state's failure to call these witnesses he was entitled to the following requested instruction #2.

"When it appears that certain witnesses would have knowledge of a fact and that they are available to a party, the jury may draw an inference from the unexplained failure of such party to call those witnesses that, if the witnesses had been called to the witness stand, they would have given testimony which would have been adverse to the interest of the party to whom they were available."

We have held "that where relevant evidence is within the control of a party whose interests would naturally call for its production, and he fails to do so without satisfactory explanation, it may be inferred such evidence would be unfavorable to him". Quint-Cities Petroleum Co. v. Maas, 259 Iowa 122, 127, 143 N.W.2d 345, 348, and citations.

We have also held "no presumption arises when it is shown that the witness is equally available to either party or when the testimony that could be elicited from such witness would merely be cumulative". State v. Parker, Iowa, 151 N.W.2d 505, 513.

In an effort to establish control of the witnesses by the state and their unavaila-

bility to him, defendant points to the doctor-patient privilege. However, "we have held that the doctor-patient relationship terminates upon the death of the patient". State v. Tornquist, 254 Iowa 1135, 1152, 120 N.W.2d 483, 493; Cross v. Equitable Life Assurance Society, 228 Iowa 800, 806, 293 N.W. 464, 467.

It therefore appears the witnesses were equally available to defendant and could have been called by him if he thought their testimony would aid his case. The medical experts called made a complete case for the state. There were no obvious omissions which the other doctors might have filled. A presumption of this kind is to be applied with caution. There must be a reason for supposing unfavorable testimony is being withheld and a factual area within which it may logically operate. The supposition must arise above the level of a mere possibility. State v. Parker, Iowa, 151 N.W.2d 505, 513.

Here there is, at most, a mere possibility that the testimony would be unfavorable. The trial court did not err in refusing requested instruction #2.

V. Defendant claims he was denied due process of law by the prosecutor's failure to disclose material evidence upon request and court order. Just prior to trial the following record was made:

"Mr. Gailey: Let the record show that in chambers the defendant renews his motion made at the time of arraignment for the State to produce any evidence in its possession which might be favorable to defendant in the preparation of his defense, and in explanation thereof states as follows:

"1. That it has come to the attention of the defendant that the testimony of the witness Dr. Raj [Dr. Song's assistant] before the Grand Jury, given some three or four days prior to the autopsy being reported, discloses that the State had knowledge of the decedent being involved in a fall and that the State interrogated the witness in that vein.

"2. That the autopsy report itself discloses that the decedent was involved in a fall to his person one day prior to the alleged offense in question.

"3. That the defense insists that if the State is in possession of any evidence or knowledge, as aforesaid, it be furnished to the defendant with particularity and specificity for the reason that, as a medical fact, and as a physical fact, there is a strong probability that the fall in question would have been the cause of decedent's death and not the alleged assault for which the defendant is on trial.

"Mr. Opheim: All knowledge within the Prosecution's investigation has been disclosed to defense counsel, Mr. Gailey. In connection with this fall, I have no knowledge, nor have I been able to uncover any knowledge of any fall on the day before the alleged fight. The only knowledge of any fall which we are aware of was elicited through a daughter of the deceased, Edna Howard. The name of Edna Howard was given to the defendant's counsel, Mr. Gailey, for purposes of checking with her on this aspect.

"The only knowledge of any fall or striking of a head that the prosecution has is the statement by Edna Howard that some time in August the deceased hit his head on the door. The best evidence that we could find with regard to any statement made of a fall, is in the records or pathology report, were derived from the source, Edna Howard, to the best of my knowledge.

"The Court: Under the statement of the county attorney, I can't go any further than I said the other day, if you have anything, give it to him.

"Mr. Opheim: In fact, he can examine my file in front of the court if he likes.

"Mr. Gailey: No."

At the trial Dr. Tyler testified decedent's daughter informed him deceased had fallen and struck his head a week prior to his hospitalization. Dr. Song testified the history received from Dr. Luka contained a statement deceased had fallen striking his head one day prior to the fight. The source of Dr. Luka's information is not certain, but apparently it was from deceased's former wife, Bessie Williams, mother of Mrs. Howard, who was a witness but did not testify on this point.

It is not clear whether defendant complains because he was not informed of these matters appearing in the medical history or because the state did not investigate further to furnish more information. He argues:

"In the interest of justice the defendant should have been made fully aware of the decedent's earlier fall because that information might have exonerated him had it been fully investigated and pursued. We are not accusing the prosecutor of bad faith in the nondisclosure but it does seem clear from the record that he knew or should have known of said evidence and especially so when defense counsel alerted him to the possibility of its existence several months prior to the trial."

From this argument it appears defendant had information concerning a fall. The medical history and autopsy report as well as the doctor's testimony before the grand jury were available to him. He apparently is asking that the county attorney do his investigating to pursue his lead on information which might be helpful to him.

We know of no case so holding. His strongest authority is Levin v. Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d 287, which ordered a new trial on the basis of "negligent nondisclosure" rather than deliberate concealment of evidence. There the court said: "Requiring government disclosure will not encourage defense counsel to be careless in trial preparation since there can be no assurance that the government, even with all its resources, will discover all significant evidence favorable to the defense. And we do not suggest that the government is required to search for evidence favorable to the accused, or to disclose all its evidence, however insignificant, to the defense." 363 F.2d at 291.

We recognize there may be instances in which a defendant's right to due process of law may be violated by concealment of material evidence, but this certainly is not one of them. The fact that we quote from Levin v. Katzenbach, supra, should not be interpreted as approving the theory of negligent nondisclosure. We need not pass upon that question here. The following cases deal generally with nondisclosure of material evidence by the prosecution. Brady v. State of Maryland, 373 U.S. 83, 87–88, 83 S.Ct. 1194, 10 L.Ed. 2d 215, 218–219; Miller v. Pate, 386 U.S. 1, 6–7, 87 S.Ct. 785, 17 L.Ed.2d 690, 694; Giles v. State of Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737; Levin v. Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d 287, 289–291; People v. Hoffman, 32 Ill.2d 96, 98–100, 203 N.E.2d 873, 874–875; State v. Thompson, (Mo.) 396 S.W.2d 697, 700–703; State v. Cook, 43 N.J. 560, 206 A.2d 359; Jordon v. Bondy, 72 App.D.C. 360, 114 F.2d 599, 601–603.

We find no error and the trial court is therefore affirmed.

Affirmed.

All Justices concur except RAWLINGS and BECKER, JJ., who concur in result.